UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DENISE NIXIDA AYALA,

                              Plaintiff,            **MEMORANDUM
                                                    AND ORDER**
              -against-                             CV 20-2596 (ARL)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
----------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        The plaintiff, Denise Nixida Ayala ("Ayala"), brought this appeal pursuant to the Social

Security Act, 42 U.S.C. § 405 et seq. (the "Act"), challenging a final determination by the

Commissioner of the Social Security Administration that she was ineligible to receive Social

Security disability insurance benefits.  Before the Court are the parties' cross motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set forth below, the

plaintiff's motion is granted, the defendant's motion is denied, and the matter is remanded for

further administrative proceedings, including a de novo hearing and new decision.

                              **BACKGROUND**

        The following facts are drawn from the parties' Joint Stipulation of Facts.

**1.      Factual Background**

        Ayala has a high school education and worked as an assistant manager in retail from

March 2001 to April 2015.  Tr. 223-24. [1]  Ayala lives in a house with her daughter and two

grandchildren that she fosters.  Tr. 231.  According to the record, fifteen months before she had

filed for disability benefits, Ayala was seen at Bellport Primary Care ("BPC") in connection with

paperwork she was required to file to become a foster parent.  Tr. 362.  She reported to a

_____
[1] Tr. are citations to the Administration Transcript found at ECF No. 17.

physician's assistant at BPC that she felt well and denied any complaints.  *Id.*  In particular, Ayala denied having blurred vision, wheezing, shortness of breath, muscle aches or painful joints.  Tr. 362-363.  The physician's assistant who examined her reported that Ayala was 5'5" and weighed 206 pounds.  Tr. 362.  Her examination also revealed that she had clear lungs, normal joints and extremities, and no edema.  Tr. 362-63.

Ayala returned to BPC on August 3, 2015, with complaints of rashes and bumps, but the report from Imrana Ahmed, D.O., who examined her, was otherwise unremarkable.  Tr. 365-66.  On November 10, 2015, Ayala returned to BPC for a third time and saw Christine Arkali, a nurse practitioner, for complaints of arm and leg weakness, numbness, and tingling.  Tr. 367.  At the examination, Ayala had normal joints, no arm or leg swelling or tenderness, normal sensation, normal gait, normal reflexes, and normal motor strength except for her left arm, which was found to be weaker than the right.  Tr. 367-68.  She was prescribed Neurontin, scheduled for tests and referred to a neurologist.  Tr. 368.

Her complaints continued, but one week later, her findings were essentially normal.  Tr. 371.  Nonetheless, on November 23, 2015, Ayala had a lumbar MRI, which revealed mild bulging at L4-L5 producing mild central canal stenosis.  Tr. 287.  The MRI also showed minimal disc bulging at L5-S1 and L1-L2.  T 287.  Cervical imaging was then performed four days later and revealed a curvature of the cervical spine that was unchanged from her prior exam.  Tr. 283.  The imaging also revealed degenerative changes at C3-C4 that projected outwards and caused a minor defect on the thecal sac.  Tr. 283.  At C4-C5, there was also a small defect on the thecal sac.  Tr. 283.

Upon return to Dr. Ahmed on December 8, 2015, Ayala complained that she had experienced one day of pain in her low back, neck, and right arm, and swelling and chest pain.

2

Tr. 373.  Except for a finding of unspecified, decreased upper extremity strength, her examination was normal.  Tr. 373.  Approximately two weeks later, Ayala had an electromyography and a nerve conduction study ("EMG/NCV"), both of which produced normal findings.  Tr. 321-25.

On December 29, 2015, Ayala then saw Edward Firouztale, D.O., at South Shore Neurologic Associates ("SSNA"), where she reported having headaches with one lasting up to 10 days.  Tr. 315.  Ayala also reported severe neck pain with numbness of the left arm and leg on an intermittent basis.  Tr. 315.  Dr. Firouztale observed decreased lumbar mobility and some posterior tenderness.  Tr. 318.  He also found her cervical ranges of motion to be minimally decreased.  Tr. 318.  Dr. Firouztale's neurological exam noted reduced strength at 4/5 in the left quadriceps and hamstrings, but found her balance, gait, sensory, deep tendon reflexes ("DTRs"), fine motor skill, coordination and the other remaining neurological findings to be unremarkable.  Tr. 318.

Ayala was not seen again until April 11, 2016, five months before she applied for benefits.  Tr. 313.  At that time, she saw Laura Buck, a nurse practitioner at SSNA.  *Id.*  Buck reported that all of Ayala's neurological findings were normal.  *Id.*  On May 4, 2016, Ayala then saw Justine Hoffmann ("Hoffmann") for a physical therapy evaluation.  Tr. 309.  During the evaluation, Ayala reported neck pain and headaches occurring for many years, which gave her daily problems.  Tr. 307.  She indicated that she used several pillows to support her neck but was struggling to sleep more than 20 minutes at a time.  Tr. 307.  Ayala further reported that taking care of her grandchildren increased her pain significantly.  Tr. 307.  Hoffmann reported that Ayala's cervical rotation and bending as well as her shoulder abduction and flexion strength were reduced.  Tr. 307-308.  Hoffman also indicated that tenderness was observed in her bilateral

3

shoulder regions and noted decreased kyphosis and lordosis.  Tr. 308.   In addition, Hoffman indicated that Ayala did not respond well to conservative modalities or manual therapy techniques.  Tr. 308.

On June 6, 2016,  Ayala saw another nurse practitioner and brought a disability form with her for the nurse practitioner to fill due to her lower back issues.  Tr. 298.  However, except for a complaint of left sacroiliac pain, her clinical examination findings were all normal - full lumbar range of motion, no sensory deficits, and normal DTRs.  Tr. 300.  Despite that finding, on June 22, 2016, Ayala saw Antigone Argyriou, M.D. for a consultation regarding her back pain.  Tr. 294.  She reported to Dr. Argyriou that she had several years of back pain, which had deteriorated over the last two years.  Tr. 294.  Ayala also advised the doctor that she had been treated with muscle relaxants and anti-inflammatories, which only transiently helped her symptoms.  Tr. 294.  She indicated that she spent most of her time taking care of her grandchildren, for whom she had full custody.  Tr. 294.  During the visit, Ayala advised Dr. Argyriou that, about a year earlier, she "had to stop working in order to take care of [them]." Tr. 294.

With respect to her examination, Ayala indicated that the back pain did not radiate and she denied any numbness, tingling, or weakness in her lower extremities.  Tr. 294.  Dr. Argyriou also noted that a lumbar spine MRI was normal.  Tr. 294.   However, Dr. Argyriou did observe that she had hyperlordotic posture and tenderness in her paraspinous process and her buttocks. Tr. 296.   He further noted that her muscle tone in the lumbar region was diminished.  Tr. 296. On examination, Ayala's lumbar ranges of motion were limited.  Tr. 296-7.  But her straight leg raise testing was normal, her hips had full pain-free range of motion, her lower extremity strength was full, her respiratory exam was normal, and her gait was normal.  *Id.*  While Dr.

4

Argyriou concluded that Ayala's neurovascular examination was normal, he did find that her low back pain was possibly secondary to a lumbar issue and was likely secondary to her deconditioned state, poor posture and poor biomechanics.  Tr. 297.  As a result, Dr. Argyriou referred Ayala to a physical therapy program and scheduled a follow-up appointment.  *Id.*

On October 27, 2016, Ayala then saw Kanista Basnayake, M.D. for a consultative medical examination in connection with her disability application.  Tr. 379.  Ayala again reported that she had back pain for years despite doing therapy and taking medications.  Tr. 379.  Ayala indicated that she lived with her daughter and grandchildren.  Tr. 380.  She stated that she showered and dressed herself daily; watched television, listened to the radio, and read; she stated that she cooked twice weekly, cleaned weekly, and shopped twice monthly.  Tr. 380.  She said she performed childcare three hours per day and attended her grandson's football games.  Tr. 380.  Upon examination, Dr. Basnayake observed decreased ranges of motion in the cervical spine, including flexion to 45, extension to 45, and reduced lateral flexion to 30.  Tr. 381.  Dr. Basnayake also observed slightly reduced lumbar extension and lateral flexion at 20 degrees but found her grip strength and dexterity to be intact.  Tr. 381.  Dr. Basnayake noted that Ayala was able to rise from a chair with no difficulty, did not need assistance to change for the exam or get on and off the exam table.  Tr. 380.  Dr. Basnayake also stated that Ayala's gait and stance were normal and she did not use any assistive devices.  Tr. 380.  Ayala was also able to perform a half squat during the examination but was unable to toe and heel walk.  Tr. 380.  Her straight leg study was also negative.  Tr. 381.  In addition, all of her other joints, including ankles, had full range of motion, were stable and had no swelling or effusion and her DTRs were physiologic and equal throughout, there were no sensory deficits or evident muscle atrophy, and her muscle strength was full at 5/5 throughout.  Tr. 381.  Dr. Basnayake opined that Ayala should avoid

5

smoke, dust and known respiratory irritants due to her asthma history and avoid driving and operating machinery due to her sleep apnea history. Tr. 382. The doctor also stated that due to her neck and back pain, Ayala would have mild limitations in prolonged sitting, standing, walking, climbing, bending, lifting, carrying, and kneeling. *Id.*

On January 30, 2017, Ayala had a cervical MRI that revealed a disc herniation and mild spinal cord impingement at C3-C4 and a bulge with uncovertebral joint hypertrophy and mild cord flattening at C4-C5. Tr. 386. The MRI also showed diffuse mild disc bulging with effacement of the ventral thecal sac and mild right foraminal stenosis at C5-C6 and some bulging with hypertrophy and mild stenosis at C6-C7. Tr. 386. The findings at the C5-C6 and C6-C7 levels were slightly more prominent than those of her prior MRI. Tr. 387. Shortly thereafter, on February 15, 2017, Colleen Defalco, a nurse practitioner examined Ayala at Brookhaven Gastroenterology Associates ("BGA") for clearance for bariatric sleeve surgery. Tr. 480. Her examination prior to surgery indicated that Ayala's neck had full range of motion, back was nontender, and upper and lower extremities retained full strength. Tr. 481-82.

On February 18, 2017, Christine Arkali ("Arkali"), an Advance Nurse Practitioner then advised that Ayala had been under her care for L1-L2 and L4-L5 disc herniations with neck pain and right arm weakness for several months. Tr. 385. Arkali opined that Ayala was unable to work due to this pain, weakness, and decreased ranges of motion. Tr. 385. She noted that medications and steroids provided little relief. Tr. 385.

Several months later, on June 14, 2017, Steven Zucker, M.D., examined Ayala at BGA. Tr. 486. Again, those records reflected that Ayala's neck had full range of motion, back was nontender, and upper and lower extremities retained full strength. Tr. 488. Dr. Zucker examined Ayala once again on October 18, 2017 and reported the same findings. Tr. 491, 494.

On November 16, 2017, Ayala was treated by Dr. Argyriou at SSNA, where she reported complete alleviation of her back pain on the left side following a L3, L4, L5, and L2 branch block. Tr. 619. However, Ayala claimed that the branch block had worsened the pain on her right side. Tr. 619. By that point, Ayala had lost a substantial amount of weight following her gastric bypass surgery, which she thought would improve her back pain, but which she claimed had not. Tr. 619. She indicated that she exercised daily, which was also not helping, and she was not interested in further physical therapy as it had not helped in the past. Tr. 619. His examination of Ayala revealed some knee effusion, swelling, and tenderness on the left but that Ayala had a normal gait, normal lower extremity strength, and normal reflexes and sensation. Tr. 621. He does not appear to have performed a back exam.

On December 5, 2017, Ayala had another MRI of her lumbar spine, which revealed moderate disc bulging at L1-L2 with small broad-based left foraminal disc herniations. Tr. 647. X-rays of her left knee were negative. Tr. 604. Two months later, on January 30, 2018, Ayala saw Dr. Zucker again and he found that her neck had full range of motion, back was nontender and all extremities had full strength. Tr. 496-97.

Ayala returned to Dr. Argyriou at SSNA on January 30, 2018, where she reported thoracic and neck pain. Tr. 623. She did not complain of low back pain at that exam. Tr. 623. She said she was having difficulty lifting her arms, reported diffuse paresthesia and weakness and said that she became fatigued doing basic activities. Tr. 623. Dr. Argyriou noted that her cervical spine showed severe apprehension, maximum tenderness, diffuse throughout, but her upper extremity strength was normal. Tr. 625. The doctor commented that there was an exaggerated pain response with even light touch throughout the cervical and thoracic paraspinal region. Tr. 625. Dr. Argyriou assessed that there was no significant etiology to explain her

7

symptoms and why she was not responding to conservative treatment.  Tr. 626.  Ayala asked Dr. Argyriou to complete disability paperwork during the exam but Dr. Argyriou instead referred her for a functional capacity evaluation.  Tr. 626.

On January 31, 2018, Ayala saw Paul Kubiak, M.D. and reported progressively worsening left knee pain.  Tr. 737. She also said she had significant pains in her knee at night. Tr. 737.  Dr. Kubiak noted Ayala's left knee showed minimal effusion and there was mild crepitus on motion.  Tr. 737.   He also noted that she had full active extension.  Tr. 737.  Dr. Kubiak reviewed Ayala's  X-ray, which showed some mild osteophytes around the patellofemoral joint in the left knee and well-maintained joint spaces overall.  Tr. 737.   Dr. Kubiak prescribed physical therapy.  Tr. 737.

In February 2018, Ayala had EMG/NCV testing that revealed no evidence of lumbar radiculopathy or peripheral neuropathy.  Tr. 768-9.  However, she also had an MRI of her thoracic spine that revealed diffuse disc dehydration, mild narrowing at T7-T8 and T8-T9, without collapse.  Tr. 653. It also revealed a left-sided herniation at T7-T8 resulting in cord flattening on the left side, and cord impingement at T8-T9.  Tr. 653.  Ayala then saw a physical therapist where she reported left knee pain, weakness, and decreased function.  Tr. 740.  She continued with therapy bi-weekly.  Tr. 741, 744-53.

On April 1, 2018, Ayala was treated by a podiatrist and reported a past history of ankle right injury and surgery.  Tr. 521.  She reported left foot pain and indicated that she could not hold her body weight with her ankle and was afraid she would collapse.  *Id.*  Her examination revealed that her bilateral ankle reflexes and patellar sensation were decreased.  Tr. 522.  It also showed her gait and stride were normal, but that she had pain, stiffness and decreased range of motion in her ankle.  Tr. 522.  Her X-ray showed post-traumatic arthritis in her right ankle and

8

neuralgia/neuritis with palpation of the left foot.  Tr. 522.  The podiatrist also prescribed physical

therapy.  Tr. 523.  Similar examinations followed.  Tr. 524, 526, 528.

In any case, four days after she was seen by the podiatrist, Ayala saw her physical

therapist, who had been treating her left knee, and reported that her right knee was to be treated

as well.  Tr. 754.  She indicated that she had pain and stiffness in both knees, exacerbated with

prolonged walking and negotiating of steps and stairs.  Tr. 754.  The physical therapist noted

moderate tenderness on the right knee and peri-patella area, painful ranges of motion, and muscle

strength to 3+/5.  Tr. 754.  She also observed crepitus in the right knee.  Tr. 754.  Ayala

continued to undergo physical therapy for her knees.  Tr. 754-63.

On April 30, 2018, Ayala received an interlaminar epidural injection at the T7-T8 level.

Tr. 633.  She reported at least 50 percent improvement at her follow-up examination two months

later but reported continued pain and stiffness after sitting for too long.  Tr. 637.   At the time,

her extremity and neurological findings were normal.  Tr. 635.  On June 26, 2018, Ayala also

told Dr. Argyriou, that she had at least 50% improvement after the epidural injection on April 30

and mentioned some intermittent pain and stiffness when she sat or lied down for too long.  Tr.

637.  The doctor reported normal extremity and neurological findings.  Tr. 640.  Similarly, on

July 31, 2018, Ayala reported to her podiatrist that the orthotics felt great, relieved her ankle

pain, and that the ankle brace he had given her also helped.  Tr. 528-29.

However, on October 4, 2018, Ayala returned to Dr. Argyriou complaining that a couple

of weeks earlier, she had a new onset of severe low back pain radiating down into her legs.  Tr.

642.  She indicated that at one point she could not leave bed for two days, after which she started

to experience severe pain and cramping.  Tr. 642.  She said that the back pain was making it

difficult for her to walk.  Tr. 642.  Dr. Argyriou noted that she had lumbar tenderness upon examination and an exaggerated pain response with diffuse tenderness even to light touch throughout the lumbar paraspinal region in the gluteal region.  Tr. 645.  He also reported that her ranges of motion were reduced in the lumbar spine.  *Id.*  Dr. Argyriou observed that Ayala made a poor effort on strength testing as well as during the physical examination.  Tr. 644.  In addition, he found her gait, reflexes and sensation were normal.  Tr. 645.

On October 19, 2018, Ayala saw Brett Silverman, D.O., and complained of lower back pain and sciatica.  Tr. 765.  Dr. Silverman noted tenderness to palpation in the lumbar spine, some restriction with forward flexion and extension, and symmetric patellar reflexes.  Tr. 765.  He reported that her straight leg study was positive on the left, but her hip, knee, and ankle strengths were all full.  Tr. 765-6.   A few weeks after the visit, Ayala had another lumbar MRI, which was notable for facet hypertrophy at L4-L5, mild bilateral neuroforaminal narrowing at L3-L4 and disc bulge and facet hypertrophy at L5-S1.  Tr. 908.  An EMG/NCV study done on October 30, 2018, showed mild chronic left L2-L3 radiculopathy.  Tr. 904.

Ayala followed up with Dr. Argyriou on November 15, 2018, where she reported an exacerbation of her back pain with radiation into her left thigh and buttock.  Tr. 894.  EMG testing done around that time revealed radiculopathy at the left L3-L4 level, with foraminal narrowing evidence at the L4-L5 level, consistent with her symptoms.  Tr. 894.  At the examination, Dr. Argyriou noted an antalgic gait as well as tenderness in her paraspinous, lumbar spine, gluteals, and buttock.  Tr. 897.  He also indicated that Ayala's lumbar range of motion was limited.  Tr. 897.

On December 5, 2018, Ayala received epidural injections in the L3-L4 and L4-L5 regions.  Tr. 899.  The next day, Ayala saw Dr. Zucker who found that her neck had full range of

motion, her neck was nontender, she had clear lungs, and her upper and lower extremities retained full strength.  Tr. 886.

Approximately two months later, Ayala saw a physical therapist in connection with her disability application who opined that she would be able to occasionally carry up to 20 pounds, frequently lift up to 10 pounds, constantly lift five pounds, could stand for one hour in an eight-hour day and could sit for 15 to 20 minutes without interruption, but never sit during work activity.  Tr.  910.  The physical therapist also noted left leg numbness and tingling, increased pain with sitting and the need for frequent changes in posture when sitting for prolonged periods. Tr. 910.  He indicated that Ayala  could frequently reach, feel, and push or pull, could occasionally bend, balance, stoop, crouch, and kneel, and could never climb or crawl.  Tr. 911. He also noted that the limitations were based on tests observed by the physical therapist, Ayala's self-reports, failed Romberg tests and complaints when reaching for objects.  Tr. 911.  He further stated that he was unable to determine any environmental limitations but that the limitations assessed had "been present since 1/31/19."  Tr.  911.

### 2.    Procedural History and Relevant Non-medical Evidence

As noted above, Ayala stopped working in April 2015.  Tr. 225.  On September 9, 2016, when she was approximately 46 years old, Ayala filed an application for Title II Disability Insurance Benefits and for Title XVI Supplemental Security Income, alleging that she had become disabled on April 1, 2015, due to back issues and osteoarthritis.   Tr. 72, 201, 203.  In a function report submitted in connection with her application, Ayala stated that she did light cleaning and made breakfast for her grandchildren; watched and played with her grandchildren; made lunch and dinner; and did laundry sometimes and hung clothes on a clothesline.  Tr. 231-34.  She said her arms and legs hurt after going up and down the stairs with two loads of laundry.

11

Tr. 233-34.  She noted that her daughter would help her when her back hurt and she felt weak. Tr. 234.  Finally, she stated that she thought weather was a factor with her breathing and bones. *Id.*

Ayala further reported that she and her daughter cared for a small dog.  Tr. 232.  She also indicated that she spent time relaxing, watching television, using her cellphone and attending her grandson's football games every Sunday.  Tr. 231-, 235.  She said her hobbies/interests were sewing, arts and crafts, and playing cards (twice a month), going to movies (once a month), and watching television and reading every day.  *Id.*  Ayala denied having any problems in performing personal care activities, except for putting on socks and strap or lace-up shoes due to difficulty bending.  Tr. 232-233.  She stated that she prepared meals four times weekly, her daughter handled the meals two days per week and they went out to eat once weekly and sometimes had take-out.  Tr. 233.  She noted that her driver's license was suspended, and she traveled by walking, riding in a car and using public transit.  Tr. 234.

Ayala stated that due to back pain, she could not sit upright for more than 20 minutes continuously and could not stand for more than 30 to 40 minutes at a time.  Tr. 235-36.  She also stated that she could not sit or stand long, lift over 10 pounds or take long walks because she had to sit in a recliner after walking for 45 minutes and had to rest for 20 to 30 minutes after walking 30 to 40 minutes.  Tr. 236-37.   Ayala said she shopped with a relative and claimed that her back would hurt after she walked for 30 to 40 minutes in a store.  Tr. 234.  She reported that she mostly stayed home but would go out to see doctors, to shop, to eat out or to attend her grandson's football games.  Tr. 235.  Ayala further indicated that kneeling and squatting were difficult and that writing for a while caused her hand and wrist to ache, but she had no problem reaching.  Tr. 236.  She stated that, sometimes, she could not finish what she started due to

tiredness or pain.  Tr. 237.  But she denied having any problems paying attention or following instructions.  Tr. 237-38.

Ayala's claims were initially denied on November 2, 2016.  Tr. 90.  Ayala requested a hearing, and one was scheduled for October 22, 2018, but the hearing was postponed due to a mix-up in scheduling.  Tr. 33.  The hearing was rescheduled to February 7, 2019, at which time Ayala testified, among other things, that she had not had spinal surgery because her surgeon estimated that there would be a fifty-fifty chance of being paralyzed.  Tr. 44.  She stated that when she sits or stands for too long, she is in pain.  Tr. 45.  She also testified that she has mosteoarthritis in her left knee, and it is constantly snapping.  Tr. 48.  She also stated that she must elevate her knee on a few pillows to alleviate some of her pain.  Tr. 49.   Finally, she testified that she has migraines which affect her vision and concentration.  Tr. 52.

In response to questions, Ayala reported at the hearing that her daughter generally helps her with chores and shopping.  Tr. 56.  She stated that she had lost about 70 pounds after the gastric bypass surgery and, at the time of the hearing, weighed 165 pounds.  Tr. 58-59.  She testified that she last worked in 2015 as an assistant manager at Walgreen's and worked there as a cashier, photo specialist/technician, and in cosmetics prior to moving up to management.  Tr. 42, 43-44.   She noted that she had left Walgreen's for a time in 2009 to work as a cashier for a check-cashing company.  Tr. 42-43.

During the hearing, a vocational expert ("VE") testified that a person with Ayala's residual functional capacity ("RFC"), age, education, and work experience, could perform her past work as a retail cashier (DOT #211.462-014, light job), check cashier (DOT #211.462-026, sedentary job) and counter clerk (DOT #249.366-010, light job), but could not perform her prior job of retail department manager (DOT #299.137-010).  Tr. 60.   The expert also noted that if

such an individual would need to elevate his or her leg to waist height during the day, there would be no past work without special accommodation.  Tr. 62.

On February 27, 2019, Administrative Law Judge Patrick Kilgannon (the "ALJ") issued an unfavorable decision.  Tr. 10-21.  The ALJ found that Ayala (1) met the insured status of the Social Security Act through December 31, 2020; (2) had not engaged in substantial gainful employment since April 1, 2015 and (3) had severe impairments of cervical, thoracic, and lumbar degenerative disc disease, remote history of right ankle fracture with surgical repair, history of asthma, and left knee osteoarthritis, but that none of her impairments met or medically equaled the severity of one of the listed impairments.  Tr. 13.  As such, the ALJ found that Ayala had the RFC to perform light work, in that she had the ability to lift/carry twenty pounds occasionally and ten pounds frequently, to sit and stand/walk six for hours in an eight-hour workday with normal breaks, to occasionally climb ramps and stairs, and to occasionally balance, stoop, kneel, crouch and crawl.  Tr. 14.  He did recommend that Ayala avoid climbing ladders, ropes or scaffolds, and hazards such as moving machinery, unprotected heights, and pulmonary irritants, such as fumes, odors, dusts, gases and poorly ventilated areas.  Tr. 14.  In sum, the ALJ found that Ayala was not disabled and could perform her past relevant work as a retail cashier, check cashier and counter clerk/photofinishing.  Tr. 19.

## DISCUSSION

### 1.    Standards

### A.    Motion for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c) should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Rojas v. Berryhill,* 368 F. Supp. 3d 668, 669 (S.D.N.Y. 2019*)* (citing *Burns Int'l Sec.*

*Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995)).  "The standard for addressing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6)." *Id.*  The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g**)**

      **B.**     **Review of ALJ's Decision**

      In reviewing a decision of the Commissioner of Social Security, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  In other words, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a de novo review").  However, "[s]ubstantial evidence [means] more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401) (internal quotation marks omitted)).

C.      **The Disability Determination**

To be eligible for disability benefits under the Act, a claimant must establish that he, she or they is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months."  42 U.S.C. § 423(d)(1)(A); *see Burgess v. Astrue*, 537 F.3d 117, 119 (2d Cir. 2008).  The Act further states that this impairment must be "of such severity that [the claimant] is not only unable to do [his, her, their] previous work but cannot, considering [his, her, their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000); *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 51 (E.D.N.Y. 2015); *Marinello v. Comm'r of Soc. Sec.*, 98 F. Supp. 3d 588, 592-93 (E.D.N.Y. 2015).

In order to determine whether a claimant is disabled within the meaning of the Act, the Social Security Administration has promulgated regulations prescribing a five-step sequential analysis for evaluating disability claims.  See 20 C.F.R. §§ 404.1520; 416.920.  The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).  The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *Id.; Nascimento*, 90 F. Supp. 3d at 51. In making these determinations, the Commissioner "must consider four factors '(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam)).

**2.    Analysis**

In this case, the ALJ found that Ayala suffered from the severe impairments of cervical, thoracic, and lumbar degenerative disc disease, remote history of right ankle fracture with surgical repair, history of asthma, and left knee osteoarthritis. Tr. 13.  He also determined that Ayala's medically determined impairments significantly limited her ability to perform basic work activities.  *Id.*  Yet, he concluded that Ayala was not disabled because her treatment records demonstrated no more than routine care for her impairments and no more than mild limitations. *Id.*  He, therefore, held that Ayala had the RFC to perform light work, noting:

> [this] includes the ability to lift/carry twenty pounds occasionally and ten pounds frequently, sit and stand/walk six hours each in an eight-hour workday with normal breaks. The claimant can never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch and crawl. The claimant must avoid hazards such as moving machinery and unprotected heights. The claimant must avoid pulmonary irritants, such as fumes, odors, dusts, gases and poorly ventilated areas.

Tr. 14.

In reaching this conclusion, the ALJ afforded little. to no, weight to the 2017 opinion of Ayala's nurse practitioner that she was disabled and "less weight" to the 2019 opinion of Ayala's

17

physical therapist that she could only stand for one hour in an eight-hour workday, choosing instead to rely entirely on the opinion of Dr. Basnayake, the consulting physician, that she had only mild limitations for prolonged sitting, standing and walking. *Zacharopoulos v. Saul,* No. 19-5075 (GRB), 2021 WL 235630 (E.D.N.Y. Jan. 25, 2021) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."). In fact, while the ALJ paid lip service to the objective evidence offered by Ayala, he outright rejected any of her subjective evidence "concerning the intensity, persistence and limiting effects of her symptoms," stating that her claims were "not entirely consistent with the medical evidence."

While the ALJ may have discounted the opinion of the physical therapist who appears to have been a one-time consultation for the purposes of completing the disability form, the fact remains that Ayala had offered numerous reports and medical tests that arguably supported both his and the nurse practitioner's determinations. Indeed, Ayala submitted the results of numerous MRIs that showed, among other things, mild bulging at L4-L5 producing mild central canal stenosis (Tr. 287), minimal disc bulging at L5-S1 and L1-L2 (T 287), a disc herniation and mild spinal cord impingement at C3-C4 and a bulge with uncovertebral joint hypertrophy and mild cord flattening at C4-C5 (Tr. 386), diffuse mild disc bulging with effacement of the ventral thecal sac and mild right foraminal stenosis at C5-C6 and some bulging with hypertrophy and mild stenosis at C6-C7 (Tr. 386), L1-L2 and L4-L5 disc herniations with neck pain and right arm weakness (Tr. 385), moderate disc bulging at L1-L2 with small broad-based left foraminal disc herniations (Tr. 647), diffuse disc dehydration, mild narrowing at T7-T8 and T8-T9, without collapse (Tr. 653), and left-sided herniation at T7-T8 resulting in cord flattening on the left side

18

and cord impingement at T8-T9 (Tr. 653). *See Burgess v. Astrue*, 537 F.3d 117, 128–29 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)) ("the opinion of a claimant's treating physician as to the nature and severity of an impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"),

Moreover, the ALJ appears to have placed significant weight on the fact that Ayala had not receive aggressive treatment for her alleged condition like spine surgery. In fact, he highlighted the fact that her treatment was only conservative – despite her testimony of the alleged risks associated with the surgery. *See Holman v. Colvin,* No. 12–CV–5817, 2014 WL 941823, at *6 (S.D.N.Y. Mar. 11, 2014) (ALJ erroneously relied on evidence that reflected conservative treatment).

The Court is also troubled by the ALJ's residual functional capacity discussion, which simply recounts the medical evidence and concludes in a conclusory fashion that Ayala can perform light work with some limitations. *See Reynolds v. Commissioner of Social Security*, No. 12-CV-1167S, 2019 U.S. Dist. LEXIS 77886, 2019 WL 2020999 (W.D.N.Y. May 8, 2019). Social Security Ruling ("SSR") 83-10, elaborates on the requirements of light work:

> The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983); *see also Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir.

2009) ("The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time.").  The ALJ took the time to point out that Ayala's physical therapist's opinion was unreliable due to the finding of extreme limitations in sitting and standing/walking (i.e., sit 0 hours and stand 0-1 hours in a workday).  But his opinion that Ayala could stand for six hours was similarly unsupported.  Indeed, the decision simply refers to the fact that Ayala was able to watch her grandchildren and assist with household chores, activities which he found to be inconsistent with her subjective complaints of pain during sitting, standing or walking.  In doing so, he disregarded Ayala's testimony that taking care of her grandchildren increased her pain significantly (Tr. 307), that if she sat or stood for too long, she was in pain (Tr. 45), or her complaints to physicians that after "taking care of her grandchildren and cleaning the basement, she was unable to move for a couple of days due to the severe muscle pain (Tr. 62).  *See Burton v. Colvin,* No. 6:12-CV-6347, 2014 U.S. Dist. LEXIS 75154, 2014 WL 2452952, at *10 (W.D.N.Y. June 2, 2014) (the ALJ erred by failing specifically to determine plaintiff's ability to sit, stand, walk, lift, carry, and bend in the context of an eight-hour workday).

For all these reasons, the Court remands this matter to the Commissioner for further proceedings.  The Clerk of Court is directed to close the case.


Dated: Central Islip, New York
          February 14, 2024

SO ORDERED:

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge